UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| AT&T CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:10-0516 |
| | ) Judge Trauger |
| v. | ) |
| | ) |
| SHOLODGE, INC. and INNLINK, LLC, | ) |
| | ) |
| Defendants.[1] | ) |

## MEMORANDUM

Pending before the court is defendant Innlink, LLC's Motion for Summary Judgment (Docket No. 67), to which the plaintiff, AT&T Corp., has responded (Docket No. 72), and Innlink has filed a reply in support (Docket No. 76). For the reasons discussed herein, Innlink's motion will be denied.

## BACKGROUND

AT&T asserts that Innlink owes AT&T money for failing to pay for telecommunications services rendered, specifically "Accu-ring" services and "frame relay" services.[2] Innlink is a "central reservation service provider for the hotel industry," and "Accu-ring" and "frame relay"

---

[1] Innlink has also filed a counterclaim, seeking attorney's fees. (Docket No. 57.)

[2] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 73 and 75) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

services are products offered by AT&T that, respectively, provide "high reliability and fault-resistant services" and connections between "multiple customer locations." (Docket No. 71 Ex. 7 at 21; Docket No. 67 Ex. 8 at 38; Docket No. 71 Ex. 3 at 41.)

The other defendant in this case is Sholodge. Under its current name, Sholodge has been a Tennessee corporation since 1991, but, according to AT&T, it is no longer "a going concern." (Docket No. 73 at 2.) Innlink, LLC commenced its existence as a Tennessee LLC on December 20, 2001, and, from that date until February 28, 2007, the sole member of Innlink was Sholodge, and Innlink was a "wholly owned subsidiary of Sholodge." (Docket No. 75 at 2.) Innlink and Sholodge were closely connected companies and shared the same office building, known as the "Sholodge Building." (Docket No. 71 Ex. 1 at 1.)

In January 2002, Sholodge and AT&T executed a Master Agreement, which served "as the general terms and conditions . . . for [] services that were provided to Sholodge and its affiliates." (Docket No. 73 at 3-5.) Between 2002 and 2007, AT&T and Sholodge also entered into "service orders," which were governed by the Master Agreement. (*Id*. at 5.) One of those service orders was for "frame relay" services, and there is no dispute that Sholodge (not Innlink) was explicitly listed as a contracting party on the service orders for "frame relay" services.

On September 18, 2002, pursuant to the Master Agreement, AT&T entered into a "service order" for "Accu-ring" services. (*Id*. at 6.) AT&T maintains that this service order was with Innlink, Sholodge's "affiliate" or "subsidiary," as indicated by the fact that the order is signed by "Michael G. Young, President, Innlink, LLC." (Docket No. 67 Ex. 10 at 1.) Innlink maintains that the service order was with Sholodge, as "Sholodge, Inc.," and not Innlink, is listed as the "customer" on the service order. (*Id*.)

2

While Sholodge (1) was listed as AT&T's "customer of record" for "frame relay" and "Accu-ring" services and (2) throughout the relevant time period received the invoices for those services, it appears reasonably clear that, over the next several years, InnLink used and paid for the "frame relay" and "Accu-ring" services. For instance, James Grout, who was president of Sholodge from 2003 to 2008, submitted an affidavit in which he stated that Innlink, from 2002 forward, was the sole user of the "Accu-ring" and "frame relay" services. (Docket No. 71 Ex. 1 at 2-3.) Grout maintains that Innlink obtained the "Accu-ring" services at the request of one of its customers and that Innlink obtained the "frame relay" services to support its business and to connect with a business partner in Arizona. (*Id.*) Additionally, AT&T filed the "InnLink, LLC Vendor Quick Report," produced in discovery, which appears to show that Innlink made payments on the services from at least 2005 to late 2008. (Docket No. 71 Ex. 4.)

On February 28, 2007, three individuals (the "purchasers"), who were essentially not previously connected to either Innlink or Sholodge – Brendan Watters, Per-Anders Wendin, and Kristin Intress – "purchased all of the membership interests in Innlink from Sholodge." (Docket No. 73 at 7.) In conjunction with this, Sholodge and Innlink executed a Purchase Agreement and a Lease Agreement, which re-leased to InnLink space in the Sholodge Building.[3]

---

[3]Through the affidavits of Intress and Grout respectively, InnLink and Sholodge dispute their obligations to each other under these agreements. Intress points out that the agreements between InnLink and Sholodge specifically excluded the "telephone switch" from the assets that Sholodge was transferring to InnLink and left responsibility for "utilities" with Sholodge, suggesting that, because Sholodge was retaining control over the central telephone system in the Sholodge Building, InnLink did not, through the purchase, assume responsibility for "Accu-ring" and "frame relay" services. (Docket No. 67 Ex. 3 at 2.) Grout disputes Intress's suggestion that Sholodge's continuing responsibility for the "phone switch" and the utilities means that Sholodge agreed to retain responsibility for "Accu-ring" and "frame relay" services, which, Grout maintains, Sholodge never used. (Docket No. 71 Ex. 1.) Rather, Grout contends, within the building there was "only one telephone switch," so Sholodge was "unable to readily separate

3

In performing due diligence in advance of the sale, the purchasers reviewed various contracts, including the agreements that provided for "Accu-ring" and "frame relay" services. While AT&T provides documentation (in the form of e-mails from Wendin) that the purchasers/Innlink used the "frame relay" service for at least a few years following the purchase (Docket No. 71 Ex. 5), there is no dispute that the purchasers desired an alternative to "Accu-ring." (Docket No. 67 Ex. 8 at 38; Docket No. 67 Ex. 4 at 28.) In light of this and the fact that the Sholodge/Innlink account was running a significant "past due" balance, the purchasers/InnLink (primarily represented by Wendin) and AT&T (primarily represented by Perry Nicodemus) spent roughly a year in negotiations for a new telecommunications services agreement.

As these negotiations commenced, both the "Accu-ring" and "frame relay" services remained in place, with the invoices for such services still going to Sholodge. On June 2, 2008, InnLink and AT&T executed a Master Agreement, which provided the general terms and conditions of service between InnLink and AT&T. (Docket No. 67 Ex. 15.) At the same time, the parties also entered into a "pricing schedule," which provided the "minimum annual revenue commitments" for InnLink to make to AT&T over the next three years. (Docket No. 73 at 17.) .

On August 22, 2008, AT&T and InnLink executed a Settlement Agreement and Release. (Docket No. 67 Ex. 17.) The Agreement specifically purports to be between AT&T and

---

out physical phone lines for Innlink when that business transferred to the purchasers." (Id.) Grout maintains that, under the terms of the Lease and Purchase Agreements, Sholodge "retained all rights to the phone switch server," but Innlink "purchased all of the special telecommunications services that it needed to run its hotel reservations business directly from AT&T." (*Id.*) As can be seen from the briefing of the parties and the court's discussion herein, these issues should be considered somewhat ancillary to the central dispute, which concerns the scope of the obligations of InnLink to AT&T.

"Sholodge d.b.a. InnLink, LLC," which is referred to as the "Customer." (*Id*. at 1.) The Agreement states that the Customer has subscribed to "Accu-ring" since 2003 (the "Former Service"), but "a dispute has arisen concerning Customer's acknowledgment of certain commitments and liabilities concerning the Former Service." (*Id*.)

In order to resolve the "Dispute," the Agreement purports that the parties have agreed that (1) the Customer, in obtaining new services from AT&T, will make a certain revenue commitment for the next three years (the "New Service," also discussed in the "pricing schedule"); (2) the Former Service will be "terminated"; (3) AT&T will waive $180,000 worth of "shortfall and termination charges . . . in connection with the Former Service;" and (4) the "Customer shall remain liable for all usage charges incurred on the Former Service." (*Id*.) The Agreement also contains a "Release," by which the parties, in consideration of the promises in the Agreement, "release and discharge each other . . . from any and all claims . . . which each may have against the other regarding the Dispute." (*Id*. at 2.)

AT&T, through the affidavit of Nicodemus, maintains that "usage charges" refer to "Accu-ring" charges from the date of the purchase through the cancellation of "Accu-ring," effective July 1, 2007, and ongoing "frame relay" charges. (Docket No. 71 Ex. 2 at 3.) InnLink vehemently disputes this, pointing out that "usage charges" is not defined and these specific "terms" are not provided in the Agreement, which purports to be "complete" and disclaims any "collateral agreements." (Docket No. 75. at 8.)

Over the months that followed the Settlement Agreement, there continued to be confusion between the parties over how much money was still owed AT&T and who was responsible for the various charges – Sholodge or InnLink. On June 4, 2009, AT&T cut off

InnLink's "frame relay" service because of non-payment of invoices; at this time, the invoices were still being sent to Sholodge. On June 5, 2009, Wendin requested that AT&T permanently terminate the "frame relay" service and provide a different type of service. In response, AT&T required InnLink to get approval from Sholodge to terminate the account, because Sholodge was still listed as the customer of record. AT&T ultimately disconnected the "frame relay" service on August 23, 2009, when Sholodge granted its consent to the termination.

On May 26, 2010, AT&T filed its Complaint in this case, asserting breach of contract and unjust enrichment claims against InnLink and Sholodge. (Docket No. 1.) On August 23, 2010, the court granted AT&T's Motion for a Default Judgment against InnLink and Sholodge. (Docket No. 29.) For reasons not germane to the present proceedings, the court later set aside that judgment against InnLink and discovery commenced. (Docket No. 41.)

## ANALYSIS

I.  **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir.2009); *see also Celotex Corp. v.*

6

*Catrett,* 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan,* 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson,* 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan,* 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)).

## II.     InnLink's Motion for Summary Judgment

In addition to attorneys' fees, interest, and late fees, AT&T seeks $121,939.74 in damages from Innlink related to unpaid "frame relay" and "Accu-ring" charges. (Docket No. 68 at 2.) As noted above, the disputed "Accu-ring" charges pertain to the time period shortly after the purchase, well before the Settlement Agreement, while the disputed "frame relay" charges date from both before and after the Settlement Agreement. On the core liability issues, Innlink has moved for summary judgment on the grounds that (1) AT&T's claims for pre-Settlement Agreement charges are barred by the Release in that Agreement, and (2) all "frame relay" charges are only properly chargeable to Sholodge. (*Id.* at 3-11.)

### A.     The Release

There is no dispute that, under the terms of the Settlement Agreement and Release, the dispute over the applicability of the Release is governed by New York law. (Docket No. 68 at 4; Docket No. 72 at 4.) New York law dictates that a release "is governed by principles of contract

7

law." *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 514 (2nd Cir. 2001). An "unambiguous" agreement, one in which there can be no "reasonable basis for a difference of opinion" as to the meaning of its terms, is to be enforced "according to its terms." *S. Road Assoc. LLC v. IBM*, 4 N.Y.3d 272, 277 (N.Y. 2005); *Met. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2nd Cir. 1990). Additionally, the court is to "give effect to the intent of the parties" by examining the contract "as a whole," making "reasonable effort . . . to harmonize all of its terms" and "give effect to . . . its general or primary purpose." *Village of Hamburg v. Am. Ref-Fuel Co. of Niagara, L.P.*, 284 A.D.2d 85, 89 (N.Y. App. 2001).

Innlink's core argument is that, as indicated above, the Settlement Agreement and Release settles all outstanding charges between Innlink and AT&T, except for "usage charges." (Docket No. 68 at 5.) Innlink maintains that "frame relay" and "Accu-ring" charges cannot be considered "usage charges" because, by definition, "usage" means "the act, way or extent of using," and, therefore, a "usage charge" will vary with the extent of use, and not be a flat monthly charge, as the "frame relay" and "Accu-ring" charges were. (*Id*. citing Webster's New World Dictionary 1469 (3d Col. Ed. 1988)). Innlink also points out that AT&T's "Business Service Guide," the definitions from which are specifically incorporated into AT&T's service orders, defines a "usage charge" as a charge "stated as a function of, and [that] var[ies] with, use." (*Id*.) Consistent with this, Innlink points out, AT&T's invoices to Sholodge and Innlink, which refer to some charges as "usage charges," do not designate "frame relay" and "Accu-ring" charges as "usage charges," but as "account level charges," "monthly charges," or "one-time charges." (*Id*. at 6.)

Because, Innlink argues, "frame relay" and "Accu-ring" charges are not "usage charges,"

8

AT&T's claims to such charges incurred by Innlink/Sholodge up until the date of the Settlement Agreement and Release (alleged to be slightly more than $87,000), were released by AT&T. (*Id*. at 7.)[4]

In response, AT&T argues that Innlink has entirely ignored the context of the parties' 2008 negotiations. (Docket No. 72 at 5.) That is, as Nicodemus stated in his affidavit, the parties intended for Innlink to be liable for "Accu-ring" services through the end of June 2007 and to pay for the "frame relay" services that Innlink concedes it had used and was using. (*Id*. at 5-6.) Moreover, AT&T points out, the Settlement Agreement and Release refers to the "Former Service" as comprising $720,000 in "annual *usage* revenue," all of which consisted of "Accu-ring" and "frame relay" services. (Id. at 8-9)(emphasis added). Further, because "Accu-ring" and "frame relay" were the "only services ever billed under the [specific] Account" covered by the Settlement Agreement and Release, it would be nonsensical to say that Innlink had continuing "usage charge" liability if "Accu-ring" and "frame relay" were not "usage charges." (*Id*. at 9.) AT&T simply maintains that the parties did not adopt the definition of "usage charges" contained in the Business Services Guide, but used the term to refer to the only charges that had ever been incurred on the specific account at issue. (*Id*. at 10.)

It does not require much analysis to see that summary judgment is inappropriate on this

---

[4]In its reply, Innlink also maintains that the Settlement Agreement and Release "evinces an intent to resolve the 'Dispute' by initiating a new customer relationship," and, therefore, it is nonsensical to read the Settlement Agreement and Release as preserving charges previously incurred. (Docket No. 76 at 4-5.) This, of course, overlooks the fact that the Settlement Agreement and Release did explicitly preserve Innlink's obligation for "usage charges" on the "Former Service." In the reply, Innlink also repeatedly argues that, if it is found to still be liable for "usage charges," then AT&T "released nothing" in the Settlement Agreement and Release. (*Id.* at 5.) That Agreement, however, recites that AT&T is releasing its right to seek considerable termination fees, so this argument, likewise, is unavailing. (Docket No. 67 Ex. 17.)

9

issue. Clearly, there are disputed issues of fact as to the parties' intent in entering into the Settlement Agreement and Release and the definition that they intended to be applied to "usage charges." Innlink points to some reasonably strong but fairly general circumstantial evidence that AT&T, when it used the words "usage charges" did not mean services such as "Accu-ring" and "frame relay." However, in addition to Nicodemus's sworn testimony on the parties' intent, AT&T advances an essentially undisputed and relatively compelling argument that, in order to mean anything, "usage charges" had to include "Accu-ring" and "frame relay." Both parties have come forward with credible arguments for why its interpretation of the term is correct, and a reasonable jury could be swayed by either argument. Therefore, the applicability of the Release is not an appropriate issue to resolve at the summary judgment stage.

### B. The Frame Relay Services

Innlink also argues that it cannot be liable for the "frame relay" charges (alleged to be slightly more than $41,000 and incurred before and after the signing of the Release) for the independent reason that Innlink and AT&T did not have a contract for the "frame relay" service. (Docket No. 68 at 7.) Innlink points out that, unlike with the confusion surrounding whether Innlink or Sholodge was the customer of record for the "Accu-ring" services, there can be no question that Sholodge was the customer for "frame relay" services, particularly given that (1) AT&T billed Sholodge (not Innlink) for the "frame relay" services and (2) AT&T would not allow the "frame relay" services on the account to be canceled without written approval from Sholodge. (*Id*. at 8-10.)

Indeed, there is no dispute that AT&T seeks recovery from Innlink here under a theory of unjust enrichment. (Docket No. 72 at 12.) The elements of a claim of unjust enrichment are: (1)

a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of that benefit; and (3) acceptance of the benefit under such circumstances that it would be inequitable for the defendant to retain the benefit without payment of the value thereof. *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966). The "most significant requirement" of an unjust enrichment claim is that the benefit to the defendant be "unjust." *Id.*. Where an unjust enrichment plaintiff had a contract with a third-party involving the same subject matter as the unjust enrichment claim, the plaintiff may not recover against the defendant unless he "exhausted his remedies against the person with whom he contracted, and still has not received the reasonable value of his services." *Id.*

Innlink argues that an unjust enrichment claim is unavailing because AT&T has a valid contract with Sholodge for the "frame relay" services and, indeed, has obtained a judgment against Sholodge. (Docket No. 68 at 10.) Therefore, Innlink suggests, if AT&T simply "exhausted its remedies" against Sholodge, it could obtain "reasonable value" for the "frame relay" services. (*Id.*) Moreover, Innlink argues, AT&T could have easily entered into an express agreement with Innlink for the "frame relay" services, but did not and simply billed Sholodge, indicating that it would not be "unjust" to deny AT&T recovery.[5] (*Id.*)

In response, AT&T argues that "this is exactly the type of situation" that unjust enrichment is "designed to cover." (Docket No. 72 at 12.) That is, (1) Innlink and Sholodge had

---

[5]Innlink also maintains that it paid Sholodge "consideration" for the AT&T services in the form of rent for the office space and Sholodge, which owned the "telephone switch" and paid the "utilities," should have paid AT&T for the "frame relay" services. (Docket No. 68 at 11.) This argument assumes too much and confuses the issue, which is centered around the simple question of whether Innlink was been unjustly enriched by not paying AT&T for services rendered.

11

a confusing interrelationship that understandably may have resulted in an account being incorrectly assigned, and (2) as demonstrated by Grout's affidavit and the record, Innlink used the "frame relay" services and Sholodge did not. (*Id*. at 12-13.) Therefore, AT&T cannot be faulted for contracting with or billing Sholodge for the services, and it is "unjust" for Innlink to have consumed services for which it did not pay. (*Id*.) Moreover, AT&T argues, it has attempted to "exhaust its remedies" against Sholodge, the contracting party, but it has "found no real property or bank accounts belonging to Sholodge and has not been able to collect any portion of the amounts due from Sholodge . . . [Sholodge] has no ongoing business concerns or assets of which AT&T is aware." (*Id.* at 15.)

Again, this is an issue the resolution of which would be inappropriate on summary judgment. Given that AT&T has brought forth admissible evidence (in the form of Grout's affidavit and the various e-mails from Wendin) that, despite the contract with Sholodge, it was Innlink that used the "frame relay" services and now refuses to pay for them, a reasonable jury could well find that it would be unjust for Innlink to retain the benefits of the services rendered without paying for them. Moreover, given the confusing interrelationship between Sholodge and Innlink and the fact that Sholodge apparently has no assets, that same jury could also find that (1) AT&T's failure to properly assign and bill the account is excusable and (2) AT&T sufficiently "exhausted its remedies" before seeking judgment against Innlink. Therefore, AT&T's claim for unjust enrichment should not be dismissed on summary judgment.[6]

---

[6]AT&T also seeks interest and fees on all "past due amounts," and both parties seek attorneys' fees. (Docket Nos. 68 at 11-13; Docket No. 72 at 15.) The appropriate time to deal with these issues is after the liability determination. In its reply, Innlink claims that AT&T, in discovery, has begun to advance a new theory of recovery; that is, that Innlink breached the Settlement Agreement and Release by failing to meet its revenue commitments under that

## CONCLUSION

For the reasons discussed herein, Innlink's Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

Agreement. (Docket No. 76 at 8.) It does not appear that this claim has been formally pled by AT&T, and, therefore, in the absence of a proper amended pleading, this does not appear to be an appropriate line of argument for AT&T at trial. (Docket No. 1 and 58; *see also* Fed. R. Civ. P. 8.) While AT&T may seek leave to amend, the court suggests that such a motion would come "late in the day" as far as these proceedings are concerned and that the resources of the parties could be better spent trying to settle this case, which involves a *relatively* small amount in controversy and reasonable arguments on both sides.